DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Paul D. Crocker, commenced this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him an R.C. 4123.57(B) award for the alleged loss of use of fingers of the left and right hands, and to enter an order granting said award.
 {¶ 2} The matter was referred to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate recommended that this court issue a writ of mandamus ordering the commission to vacate the November 5, 2003 order of its deputy, and to enter an amended order consistent with the magistrate's decision that adjudicates relator's motion for an R.C. 4123.57(B) award. The commission and respondent Sauder Woodworking Company ("Sauder") have filed objections to the magistrate's decision, and the matter is now before this court for a full, independent review.
 {¶ 3} By its objection to the magistrate's decision, Sauder asserts that the magistrate erred in his interpretation of State ex rel. Zamorav. Indus. Comm. (1989), 45 Ohio St.3d 17. Sauder argues that the magistrate has erroneously extended Zamora to the facts of this case. Sauder's argument is unpersuasive.
 {¶ 4} Zamora precludes the commission from relying upon evidence that it previously found unpersuasive. Here, when it terminated temporary total disability compensation on April 25, 2003, the commission relied upon Dr. Gregory Ornella's January 15, 2003 report finding that relator had reached maximum medical improvement ("MMI"). In reports dated February 17 and 28, 2003, Dr. Allan Clague stated his contrary belief that relator had not reached MMI. In a June 10, 2003 report, Dr. Clague again stated his position that neurological improvement could be expected. Thus, as the magistrate correctly noted in his decision, "Dr. Clague's June 10, 2003 report simply reiterates his findings contained in the February 17 and 28, 2003 reports regarding MMI." Appendix at ¶ 38. When the commission denied relator's motion requesting a loss of use award, it violated Zamora because its reliance upon Dr. Clague's MMI opinion contained in the June 10, 2003 report resulted in essentially the revival of evidence that the commission had previously rejected.
 {¶ 5} In its objections to the magistrate's decision, the commission argues that "[i]t is error to automatically exclude any and all parts of a previously `rejected' report." (Commission's objections, at 2.) The commission states that it "seeks clarification as to whether any and all parts of a previously `rejected' report, are excluded from consideration when deciding further applications or motions for other types of benefits." (Id. at 2-3.) In view of the facts of this case, it is unnecessary to analyze the issue as stated by the commission.
 {¶ 6} The commission also argues that "the magistrate erred to the extent the magistrate implied that a decision regarding MMI is binding on the commission regarding a subsequent application for loss of use." (Id. at 4.) Such a determination is not implicit in the magistrate's decision. The magistrate simply resolved that Zamora precluded the commission from denying an award for loss of use on the basis that Dr. Clague's report states that neurological improvement of the fingers could be expected.
 {¶ 7} Based on the foregoing, this court finds that the magistrate has properly discerned the pertinent facts and applied the relevant law to those facts. Accordingly, respondents' respective objections to the magistrate's decision are hereby overruled. Pursuant to Civ.R. 53(E)(4)(b), this court adopts the magistrate's decision as its own, including the findings of fact[1] and conclusions of law contained therein. In accordance with the magistrate's decision, this court hereby grants a writ of mandamus, directing the commission to vacate the November 5, 2003 order of its deputy denying relator's motion requesting the loss of use award, and to enter an order that re-determines, in a manner consistent with this decision, relator's motion for an R.C.4123.57(B) award.
Objections overruled; writ granted.
McGrath and McCormac, JJ., concur.
McCormac, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Paul D. Crocker, :
 Relator, :
v. : No. 04AP-820
Industrial Commission of Ohio and : (REGULAR CALENDAR)
Sauder Woodworking Company, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on February 11, 2005 Gallon Takacs Co., L.P.A., and Theodore A. Bowman, for relator.
Jim Petro, Attorney General, and Kevin J. Reis, for respondent Industrial Commission of Ohio.
Porter, Wright, Morris Arthur LLP, and Christopher C. Russell, for respondent Sauder Woodworking Company.
IN MANDAMUS
 {¶ 8} In this original action, relator, Paul D. Crocker, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him an R.C. 4123.57(B) award for the alleged loss of use of fingers of the left and right hands, and to enter an order granting said award.
Findings of Fact:
 {¶ 9} 1. Relator sustained an industrial injury while employed with respondent Sauder Woodworking Company ("Sauder"), a self-insured employer under Ohio's workers' compensation laws. He began his employment with Sauder in March 1993. Most of the work he performed for Sauder involved repetitive motions. He operated a cardboard slitter machine and loaded hardware onto a pack line. He also drove a forklift. Around December 1998, relator developed pain in his lower neck region. Because the neck pain increased over the next two months, on February 18, 1999, relator saw his family physician who then referred him to a neurologist for diagnostic testing. February 18, 1999 is the official date of relator's injury in his industrial claim, which is assigned claim number 99-381344.
 {¶ 10} 2. Sauder initially certified the claim for "bilateral carpal tunnel syndrome."
 {¶ 11} 3. In May 1999, relator underwent a right carpal tunnel release. In June 1999, he underwent a left carpal tunnel release.
 {¶ 12} 4. The claim was subsequently allowed for "bilateral reflex sympathetic dystrophy, upper limb."
 {¶ 13} 5. Relator returned to light duty work at Sauder following his carpal tunnel releases. However, around November 2000, he was taken off work by his doctor. He began receiving temporary total disability ("TTD") compensation from Sauder.
 {¶ 14} 6. On January 15, 2003, relator was examined, at Sauder's request, by Gregory A. Ornella, M.D., who specializes in occupational medicine. Dr. Ornella reported:
On physical examination, this is a well-developed, obese, 53-year-old, white male, in no apparent distress, who is reportedly left-hand dominant. He has well-healed incisions on the volar aspects of the wrists and hands bilaterally. He is able to flex the first, second, and third digits of the right hand, however he is unable to flex the fourth finger at the proximal and distal interphalangeal joints. He is able to flex the fourth finger at the metacarpophalangeal joint up to 42 degrees. The right fifth finger is fully extended at the distal and proximal interphalangeal joints, and it remains in hyperextension to greater than 30 degrees at the metacarpophalangeal joint. He has limited flexion and extension of the right wrist, as well as limited radial and ulnar deviation at the right wrist. He has very limited motion at the left thumb with mild flexion and extension present at the metacarpophalangeal joint. The left index finger is fully extended at the distal and proximal interphalangeal joints, and it remains fixed in flexion at 60 degrees at the metacarpophalangeal joint. The left third finger is fully extended at the distal and proximal interphalangeal joints, and it is fixed in flexion at the metacarpophalangeal joint at 55 degrees. The left fourth finger is fully extended at the distal and proximal interphalangeal joints, and it remains fixed in flexion at the metacarpophalangeal joint at 25 degrees. The left fifth finger is fully extended at the distal and proximal interphalangeal joints and abducted to 45 degrees at the metacarpophalangeal joint. Mid-arm circumferences measured 10.0 cm. above the lateral epicondyles are 53.0 cm. bilaterally. Mid-forearm circumferences measured 10.0 cm. below the lateral epicondyles are 35.0 cm. on the right, and 36.0 cm. on the left. Swelling is noted to be present on the dorsum of the hands, which is more significant in the left hand. He reports pain in the digits of the left hand and palm with pressure applied to those regions. He has decreased reflexes present in the upper extremities bilaterally. He is able to extend the left forearm to 91 degrees, with flexion of the right forearm at the elbow to 50 degrees. Range of motion of the right shoulder is measured at 52 degrees of flexion, 33 degrees of extension, 73 degrees of abduction, and 45 degrees of adduction. He states he is unable to move the left wrist, which remains fixed in the neutral position. He reports that he is unable to move the left elbow, which remains flexed at 86 degrees of flexion. He claims he is unable to move the left arm at the shoulder joint, which remains in the neutral position.
* * *
In summary, Mr. Crocker has a claim which is allowed for a bilateral carpal tunnel syndrome and reflex sympathetic dystrophy as a result of his claimed work-related incident occurring on or about February 18, 1999. Mr. Crocker continues to have significant objective findings on physical examination as noted previously in this report. Based on my examination at this time, the extensive history provided by Mr. Crocker, as well as a review of the available medical records, it is my opinion that Mr. Crocker has reached maximum medical improvement when considering the allowed conditions of this claim (i.e., bilateral carpal tunnel syndrome and reflex sympathetic dystrophy) in conjunction with the Bureau of Worker's [sic] Compensation Claim #99-381344. As stated by Mr. Crocker, his symptomatology appears to have improved somewhat within the last year, especially with respect to pain in his upper extremities. He notes his symptoms have stabilized with treatment by Dr. Clague within the last year, and it is my opinion that with the continued maintenance care Mr. Crocker would be expected to continue in his present state without significant change over the following six months. Therefore, by definition[,] Mr. Crocker has reached maximum medical improvement with respect to his claim allowance (Claim #99-381344).
 {¶ 15} 7. On February 3, 2003, Sauder moved to terminate TTD compensation based upon Dr. Ornella's January 15, 2003 report.
 {¶ 16} 8. On February 17, 2003, neurologist Allan G. Clague, M.D., who had been treating relator for reflex sympathetic dystrophy ("RSD") syndrome, wrote to relator's counsel as follows:
Since initially seeing him on Thursday, November 7, 2001 I have been seeing and treating him regularly since that time and I last saw and evaluated him on January 21, 2003. It certainly is clear on the basis of his current neurological examination and clinical history that Mr. Paul D. Crocker has not reached maximal medical improvement and in this regards I certainly disagree with Dr. Ornella and I certainly expect significant improvement to occur over time.
Although it is certainly true that Mr. Crocker has limitation of movement with respect to the right and left hands as well as right and left upper extremities these are in fact no way equivalent to him having had them amputated. Inasmuch as he does have some functional use and ability of the upper extremities (i.e. he can feed himself) I can in no way support any claim that his extremities are such as if they had essentially been amputated.
 {¶ 17} 9. Relator's counsel asked Dr. Clague to review Dr. Ornella's January 15, 2003 report and to respond in writing. Dr. Clague responded on February 28, 2003:
* * * I expect him to continue to show further improvement of his underlying neurological condition with respect to the reflex sympathetic dystrophy syndrome * * * and our aim is to further reduce the pain and swelling in his upper extremities and also to increase the functional use of the upper extremities. On the basis of extensive experience in treating this underlying disorder there has been nothing present in the clinical condition of Mr. Paul D. Crocker to indicate that it is not reasonable to expect further improvement in his underlying clinical neurological status. It is because of this that I am continuing to treat him and it is also because of this that I certainly do not feel that he has reached maximum medical improvement. With continued treatment I expect continued improvement and this has been borne out thus far during the first 14 months of treatment of this individual.
The basic aim of our treatment is to reduce the intensity of his pain and discomfort as well as the swelling in the extremities and also to reduce the dystonic posturing of his hands to provide increased mobility of the hands and fingers and also to provide increased mobility and usefulness of both upper extremities. This is to be achieved with the use of medical therapy and does not require any surgical or invasive intervention. At the present time we are undertaking to intensify the treatment of his underlying dystonic posturing of the hands. In addition, I am pleased that there has been a reduction in the dermatological manifestations or sores on various area[s] of his body.
 {¶ 18} 10. On February 26, 2003, citing Dr. Ornella's January 15, 2003 report, relator moved for an R.C. 4123.57(B) scheduled loss award for the alleged loss of use of fingers of the left and right hands. The motion alleged that relator has sustained "complete ankylosis of the DIP and PIP joints of the right fourth finger and the DIP, PIP and metacarpal joints of the right fifth finger," and "complete ankylosis of the DIP, PIP and metacarpal joint of the second, third, fourth and fifth fingers of the left hand."
 {¶ 19} 11. Following a March 7, 2003 hearing, a district hearing officer ("DHO") issued an order denying Sauder's February 3, 2003 motion to terminate TTD compensation. The DHO's order states:
Injured worker is unable to return to his former position of employment, he has not reached Maximum Medical Recovery, as he is undergoing treatment and is expected to improve. Temporary total disability compensation is to continue upon submission of medical proof.
This order is based on the report of Dr. Clague, dated 02/28/2003.
 {¶ 20} 12. Sauder administratively appealed the DHO's order of March 7, 2003.
 {¶ 21} 13. Following an April 25, 2003 hearing, a staff hearing officer ("SHO") issued an order vacating the DHO's order of March 7, 2003. The SHO found that the industrial injury had reached maximum medical improvement ("MMI") based upon Dr. Ornella's January 15, 2003 report. TTD compensation was terminated effective April 25, 2003.
 {¶ 22} 14. Earlier, on March 26, 2003, Dr. Ornella issued an addendum to his January 15, 2003 report in response to a request from Sauder's counsel to review relator's motion. Dr. Ornella wrote:
The Motion does correctly identify the affected joints of the digits of the right and left hands where there is complete loss of motion and essentially "ankylosis" of those joints. The metacarpal joints referred to in the right fifth finger and in the second, third, fourth, and fifth fingers of the left hand are, for anatomical correctness, known as the metacarpophalangeal joints and should be stated as such. * * *
* * * [I]n my opinion, I would support the claimant's motion for loss of range of motion or ankylosis at the anatomical regions presented in the Motion with changes as I have previously stated. For purposes of an impairment rating, the anatomical regions referred to in the Motion are consistent with the loss of range of motion or "ankylosis" documented on my examination of Mr. Crocker.
 {¶ 23} 15. On April 25, 2003, the SHO who heard the appeal from the DHO's order of March 7, 2003, also sat as a DHO and heard relator's February 26, 2003 motion for an award for loss of use of fingers of the hands. Following the April 25, 2003 hearing, the DHO issued an order granting relator's February 26, 2003 motion for an R.C. 4123.57(B) award. The DHO's order of April 25, 2003 states:
The District Hearing Officer grants COMPLETE LOSS OF USE as a result of the ANKYLOSIS FOR THE RIGHT RING AND LITTLE FINGERS and LEFT INDEX, MIDDLE, RING AND LITTLE FINGER. This results in a total award of 135 weeks.
This order is based upon the report of Dr. Ornella 1/15/03.
(Emphasis sic.)
 {¶ 24} 16. Sauder administratively appealed the DHO's order of April 25, 2003, granting an R.C. 4123.57(B) award.
 {¶ 25} 17. On June 3, 2003, relator was examined at Sauder's request, by Thomas E. Lieser, M.D., who specializes in occupational and environmental medicine. Dr. Lieser reported:
Discussion:
The claimant's presentation reveals no objective finding consistent with true ankylosis of the digits, as the claimant holds the digits in a firmly fixed position. X-rays show no true bony ankylosis at any of the joints of any of the digits of the left hand, and in fact, varus and valgus stress of the MP joints of various digits of the left hand shows definite laxity. It is quite difficult to separate out psychiatric induced disuse atrophy from a true RSD, as the clinical sequela of both will remain inseparable.
Essentially, the claimant does not use the left hand. The claimant has reached maximum medical improvement based on evaluations by Dr. Clague and today's clinical examination. There indeed is little evidence that the claimant has shown any improvement over the last four years, and indeed there has been no substantial improvement.
The claimant simply does not use the left upper extremity for anything, maintaining a fixed, rigid position against the chest wall with the elbow flexed at 90°. It was impossible for this examiner to effectively examine anywhere along the volar surface of the forearm because of his pain complaints and rigidly held posture. This is found not only in the elbow and shoulder, but especially the wrist and digits. He is able to move the left thumb effectively, but maintains a rigid posture of digits two, three, four, and five.
Regarding the right hand, he maintains the same bizarre abducted and extended posture for both little fingers. He does show motion in the left ring finger.
Conclusions:
Based on today's evaluation, I would offer the following:
1) The claimant demonstrates no functional use of left digits two, three, four, and five. They remain in a fixed, rigid position at all joints, MP, PIP, and DIP. Neurologic functioning, however, remains entirely intact with two point discrimination, as well as light touch, pinprick, and vibration.
2) The cause of his inability to use the fingers is certainly questionable. It was Dr. Hui's opinion that the claimant had a high likelihood of a conversion disorder, and indeed the presentation today suggests just that. This of course is not an allowed condition in the claim. Nonetheless, based on the electrodiagnostic studies and clinical examination, it is difficult to attribute the current functional state of his left hand to an organic process. It is Dr. Clague's opinion that the claimant suffers from RSD induced rigidity of the left upper extremity. That may apply to the left upper extremity, however, it is medically illogical that the RSD would "spread" to the right upper extremity and now supposedly the left leg. In addition, the claimant does demonstrate motion at the right ring finger. He is able to demonstrate appropriate grip motions of the right hand with some limited involvement of the ring finger, while continuing to maintain the extended and abducted position of the right little finger. One cannot attribute the right handed findings involving the digits to the allowed conditions of this claim. With respect of the left hand, the claimant, as noted above, maintains a rigid position of the left second, third, fourth, and fifth digits involving all joints, MP, DIP, and PIP with essential functional ankylosis of all four fingers. Given this loss of use due to complete ankylosis of the MP, PIP, and DIP joints of left digits two, three, four, and five is present.
18. On June 10, 2003, Dr. Clague wrote:
* * * [H]e first of all does not have ankylosis of any of the distal or proximal interphalangeal joints of the fingers of either hands. Ankylosis is an immobility and consolidation of a joint due to disease, injury, or surgical procedure. The immobility of the joints in the hands of Mr. Crocker is not related to ankylosis but rather to the underlying reflex sympathetic dystrophy syndrome * * * involving his upper extremities.
It is because of this fact that I feel with continued treatment of his underlying neurological disorder that we can rightfully expect improvement in his overall neurological status including that of the fingers of his hands. The underlying pathophysiology here is quite different then ankylosis which is not present.
 {¶ 26} 19. Following a June 19, 2003 hearing on Sauder's administrative appeal from the DHO's order of April 25, 2003, an SHO issued an order that vacated the DHO's award:
The opinion of Dr. Clague is most persuasive. Dr. Clague is the attending neurologist who is a specialist in reflex sympathetic dystrophy. Dr. Clague opines that the injured worker does not suffer from loss of use due to ankylosis.
Therefore, it is the order of this Staff Hearing Officer to DENY payment of a loss of use for the right fourth and fifth fingers, and the left second, third, fourth, and fifth fingers. This order is based upon the report(s) of Dr. Clague (6/10/03).
(Emphasis sic.)
 {¶ 27} 20. Relator filed an administrative appeal from the SHO's order of June 19, 2003. On November 5, 2003, a commission deputy heard relator's administrative appeal. Thereafter, the deputy issued an order on behalf of the three-member commission, stating:
It is the order of the Deputy that the order of the Staff Hearing Officer, dated 06/19/2003, is affirmed.
* * *
The injured worker's motion requested:
1. Payment of loss of use award pursuant to 4123.57(B) due to complete ankylosis of the DIP and PIP joints of the right fifth finger.
2. Payment of loss of use award due to complete ankylosis of the DIP, PIP and metacarpal joint of the second, third, fourth, and fifth fingers of the left hand.
3. Grant payment of benefits commencing January 15, 2003 through the present and continuing.
The employer's counsel correctly points out that the injured worker does not have ankylosis which would result in the loss of use award. The medical reports of Dr. Ornella, Dr. Lieser, and Dr. Clague attributes the restricted motion of the aforementioned digits due to the allowed condition of "bilateral reflex sympathetic dystrophy." However, the mere fact that the injured worker does not have ankylosis does not preclude the injured worker from receiving a loss of use award. In State ex rel.Green v. Ohio Dept. of Mental Retardation and Developmental Disabilities
(2002), 97 Ohio St.3d 260, the Ohio Supreme Court cited an opinion from an earlier case, State ex rel. Gassman v. Indus. Comm. (1975),41 Ohio St.2d 64. Specifically, the Court reiterated its earlier opinion that, "a loss of use of body parts is compensable if it is `to the same effect and extent as if they had been amputated or otherwise physically removed.'" Gassman at 67. The Court went on to state "this would include not only ankylosis, but any industrially induced condition that produced the requisite degree of loss — an interpretation consistent with R.C.4123.95's requirement of liberal construction in favor of employees."Green at 261.
An award pursuant to R.C. 4123.57(B) and the above court cases presupposes that the requested loss of use award is due to a permanent loss of use of the body part involved. As noted above, the injured worker is being treated by Dr. Clague, a specialist in the field of reflex sympathetic dystrophy. In fact, Dr. Clague's report, dated 01/17/2003 indicates that the injured worker has seen Dr. Clague 13 times between 11/07/2001 and 01/20/2003. Thus, Dr. Clague is in a position to opine as to whether the injured worker has a loss of use of the aforementioned digits. In this light, the report of Dr. Clague, dated 06/10/2003, defeats the injured worker's motion. More specifically, Dr. Clague states "(i)t is because of this fact that I feel with continued treatment of his underlying neurological disorder that we can rightly expect improvement in his overall neurological status including that of the fingers of his hands."
Based on the opinion of Dr. Clague, the Deputy finds that it is not certain that the injured worker has sustained a permanent loss of use of the digits so as to qualify for the award requested. Accordingly, the motion requesting the loss of use award for the various digits is denied.
 {¶ 28} 21. On August 13, 2003, relator, Paul D. Crocker, filed this mandamus action.
Conclusions of Law:
 {¶ 29} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 30} R.C. 4123.57(B) provides a schedule of compensation for the loss of enumerated body parts. The hands, thumbs and fingers are among those enumerated parts for which compensation can be granted. R.C.4123.57(B) further provides:
For ankylosis (total stiffness of) or contractures (due to scars or injuries) which makes any of the fingers, thumbs, or parts of either useless, the same number of weeks apply to the members or parts thereof as given for the loss thereof.
If the claimant has suffered the loss of two or more fingers by amputation or ankylosis and the nature of the claimant's employment in the course of which the claimant was working at the time of the injury or occupational disease is such that the handicap or disability resulting from the loss of fingers, or loss of use of fingers, exceeds the normal handicap or disability resulting from the loss of fingers, or loss of use of fingers, the administrator may take that fact into consideration and increase the award of compensation accordingly, but the award made shall not exceed the amount of compensation for loss of a hand.
 {¶ 31} In State ex rel. Alcoa Building Products v. Indus. Comm.,102 Ohio St.3d 341, 342-343, 2004-Ohio-3166, at ¶ 10, the court succinctly set forth the historical development of scheduled awards for loss of use under R.C. 4123.57(B). The Alcoa court states:
Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970's, two cases — Stateex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, * * * andState ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402, * * * — construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. Gassmann and Walker both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed."Gassmann, 41 Ohio St.2d at 67 * * *; Walker, 58 Ohio St.2d at 403-404[.] * * *
 {¶ 32} Moreover, the provision of R.C. 4123.57(B) regarding ankylosis and contractures, as quoted above, cannot be interpreted to restrict compensation to only those injured workers who have ankylosis or contractures. State ex rel. Green v. Ohio Dept. of Mental Retardation andDevelopmental Disabilities, 97 Ohio St.3d 260, 2002-Ohio-6340. Compensation is provided not only for ankylosis, but for any industrially induced condition that produces the requisite degree of loss. Id.
 {¶ 33} Here, the commission's deputy, noting that loss of use must be "permanent" to support an R.C. 4123.57(B) award, relied upon Dr. Clague's June 10, 2003 report to deny the award. Relator argues that the rule set forth in State ex rel. Zamora v. Indus. Comm. (1989), 45 Ohio St.3d 17
and its progeny, precluded the commission's reliance on Dr. Clague's June 10, 2003 report. The magistrate agrees.
 {¶ 34} Zamora prohibits the commission from relying on a medical report that the commission had earlier found unpersuasive. Zamora is properly invoked when the commission tries to revive evidence that was previously deemed unpersuasive. State ex rel. Tilley v. Indus. Comm.
(1997), 78 Ohio St.3d 524, 528.
 {¶ 35} As previously noted, the commission terminated TTD compensation effective April 25, 2003, based upon Dr. Ornella's opinion that the industrial injury had reached MMI. In so doing, the commission implicitly rejected the opinions expressed in Dr. Clague's February 17 and 28, 2003 reports that the industrial injury had not reached MMI.
 {¶ 36} Following the November 5, 2003 hearing, the commission's deputy "affirmed" the SHO's order of June 19, 2003, but offered a different explanation for denial of the award. Noting that a loss of use must be "permanent" in order to be compensable under R.C. 4123.57(B), the deputy found that Dr. Clague's June 10, 2003 report renders uncertain the requisite permanency of the alleged loss of use. Because Dr. Clague stated in his June 10, 2003 report that neurological improvement of the fingers could be expected, the deputy denied the award.
 {¶ 37} Parenthetically, the deputy correctly criticized the SHO's reasoning which suggests, contrary to Green, supra, that relator cannot be awarded compensation unless there is true ankylosis.
 {¶ 38} That Dr. Clague's June 10, 2003 report was not in existence when the commission terminated TTD compensation based upon Dr. Ornella's report does not render Zamora inapplicable. Dr. Clague's June 10, 2003 report simply reiterates his findings contained in the February 17 and 28, 2003 reports regarding MMI. Thus, the MMI opinion of Dr. Clague in his June 10, 2003 report was effectively rejected when the commission accepted Dr. Ornella's MMI opinion.
 {¶ 39} Based upon the above analysis, the magistrate finds that the deputy's order is premised upon the revival of evidence that was previously found by the commission to be unpersuasive. Accordingly,Zamora bars the commission from denying an award on grounds that Dr. Clague found that improvement could be expected.
 {¶ 40} It should be further noted, contrary to the commission's suggestion here, that the commission cannot deny an award based simply upon the fact that relator's own physician, Dr. Clague, failed to provide a report supporting the award. Relator requested an award based upon the January 15, 2003 report of Dr. Ornella which the commission had previously accepted, at least in part, to terminate TTD compensation. Dr. Ornella, in a subsequent report dated March 26, 2003, states that he supports the claimant's motion. Dr. Lieser issued a report that finds loss of use in the digits of the left hand. Those reports could conceivably support an award. However, it is the commission that must evaluate and weigh the medical evidence after eliminating Dr. Clague's opinions regarding permanency.
 {¶ 41} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate the November 5, 2003 order of its deputy, and to enter an amended order consistent with this magistrate's decision that adjudicates relator's motion for an R.C. 4123.57(B) award.
[1] We note that the magistrate's 21st finding of fact states that relator filed this mandamus action on August 13, 2003. The action was actually filed on August 13, 2004.